No. 25-1050

---

UNITED STATES BANKRUPTCY APPELLATE PANEL
OF THE NINTH CIRCUIT

---

In re:  RENO CITY CENTER OWNER, LLC,
Debtor (Chapter 11)

CHRISTOPHER BEAVOR, ET AL.,
Appellants,

vs.

RENO CITY CENTER OWNER, LLC, ET AL.,
Appellees.

---

Appeal from the United States Bankruptcy Court for the District of Nevada,
Case No. 24-50152-hlb
The Honorable Hilary L. Barnes, United States Bankruptcy Judge

---

**BRIEF OF APPELLEE RENO CITY CENTER OWNER, LLC**

---

Elizabeth Fletcher
Nevada Bar No. 10082

**FLETCHER & LEE**
488 Ridge Street
Reno, Nevada 89501
Telephone:  775.324.1011
efletcher@flecterlawgroup.com

COUNSEL FOR DEBTOR RENO
CITY CENTER OWNER, LLC

Brian J. Levy
Georgia Bar No. 302518

**MORRIS, MANNING & MARTIN LLP**
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
Telephone: (404) 233-7000
blevy@mmmlaw.com

COUNSEL FOR DEBTOR RENO CITY
CENTER OWNER, LLC

*Motion for Admission Pro Hac Vice Pending*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8012, Appellee Reno City Center Owner, LLC hereby discloses the parent companies listed in the table below. No publicly held corporation owns 10% or more of its stock.

| <u>Entity</u> | <u>Relationship</u> |
|---|---|
| Reno City Mezzanine Borrower, LLC | Direct parent |
| Reno City Center, LLC | Indirect parent |
| Madison Reno Manager, LLC | Indirect parent |
| Madison Capital Group LLC | Indirect parent |

# CERTIFICATE REQUIRED BY BAP R. 8015(a)-1(a)

[25-1050, Reno City Center Owner, LLC]

The undersigned certifies that the following parties have an interest in the outcome of this appeal. These representations are made to enable judges of the Panel to evaluate possible disqualification or recusal:

1.  The "Appellants" comprised of (a) Christopher Beavor, an individual; (b) Bristlecone Management, LLC; (c) CAI Reno Hotel OZ Fund, LLC; (d) CAI Development, LLC; (e) CAI Investments, LLC; (f) CAI Investments Healthcare Products II DST; (g) CAI Investments Sub Series 300, LLC; (h) CAI Reno Hotel Partners, LLC; (i) CAI Tempe Hotel Partners, LLC; (j) PFM Harvard, LLC; (k) Silver State Realty & Investments.  The Appellants are disputed unsecured insider creditors of the Debtor.

2.  Delphi CRE Funding, LLC was a secured creditor of Debtor.

3.  Luxe Industries, LLC is a disputed unsecured insider creditor of the Debtor.

4.  The Official Committee of Unsecured Creditors comprised of (a) Luis Delacruz dba Optimum Flooring; (b) Sean G. Frey of SGF Engineering; (c) Robert Amster of Sierra Display Fixtures, Inc.; (d) Mary Beth Tucker of Luxe Industries, LLC and; (e) Patrick DeLaVergne of Quick Space.

5.  Reno City Center Owner, LLC is the Debtor.

6.  Madison Capital Group, LLC is an indirect parent of the Debtor.

| | |
|---|---|
| **FLETCHER & LEE** | **MORRIS, MANNING & MARTIN LLP** |
| */s/ Elizabeth Fletcher* | */s/ Brian J. Levy* |
| Elizabeth Fletcher | Brian J. Levy |
| Nevada Bar No. 10082 | Georgia Bar No. 302518 |
| 488 Ridge Street | blevy@mmmlaw.com |
| Reno, Nevada 89501 | 1600 Atlanta Financial Center |
| Telephone: 775.324.1011 | 3343 Peachtree Road, N.E. |
| efletcher@flecterlawgroup.com | Atlanta, Georgia 30326 |
| | Telephone: (404) 233-7000 |
| COUNSEL FOR DEBTOR RENO CITY CENTER OWNER, LLC | COUNSEL FOR DEBTOR RENO CITY CENTER OWNER, LLC |
| | *Motion for Admission Pro Hac Vice Pending* |

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ........................................................ ii

TABLE OF CONTENTS .................................................................................... v

TABLE OF CITATIONS ................................................................................... vii

I.     JURISDICTIONAL STATEMENT .................................................... 1

II.    STATEMENT OF THE ISSUES PRESENTED  AND STANDARD OF REVIEW ....................................................................................................... 2

III.   STATEMENT OF THE CASE ............................................................ 2

   A.   Debtor's Pre-Bankruptcy History. ................................................ 3

   B.   Debtor's Bankruptcy Case. ........................................................... 4

   C.   Debtor's Settlement with Delphi ................................................... 5

   D.   Appellants' Claims and Debtor's Objections Thereto. .................. 8

   E.   The Competing Plans of Reorganization. ................................... 10

   F.   Debtor's Motion to Dismiss the Bankruptcy Case ..................... 11

   G.   Dismissal of the Bankruptcy Case. ............................................. 14

IV.   SUMMARY OF THE ARGUMENT ............................................... 17

V.    ARGUMENT AND CITATION OF AUTHORITIES ...................... 19

   A.   Appellants Lack Standing to Appeal the Dismissal Order. ......... 19

      1.   Appellants Lack Article III Standing. ..................................... 19

      2.   Appellants Lack Prudential "Person Aggrieved" Standing. .... 21

   B.   The Dismissal Order Does Not Violate *Jevic*. ............................ 22

      1.   Structured Dismissals and the *Jevic* Holding. ......................... 22

      2.   The Dismissal Order is Not a Priority-Skipping Structured Dismissal. ..24

3.  Appellants Fail to Demonstrate that the Bankruptcy Court Abused its Discretion by Entering the Dismissal Order. ...........................................26

VI.  CONCLUSION ............................................................................31

CERTIFICATE OF COMPLIANCE........................................................33

CERTIFICATE OF SERVICE ...............................................................34

# TABLE OF CITATIONS

## Cases

*Bank of America Nat'l Trust & Sav. Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 119 S.Ct. 1411 (1999) ................................................................29

*Clifton Capital Group, LLC v. Sharp (In re East Coast Foods, Inc.),* 80 F.4th 901, 905 (9th Cir. 2023) ............................................................ 2, 19, 20, 21

*Czyzewski v. Jevic Holdings Corp.,* 580 U.S. 451, 137 S. Ct. 973 (2017) ..... passim

*In re Naartjie Custom Kids, Inc.,* 534 B.R. 416 (Bankr. D. Utah 2015) .................29

*In re Nordlicht,* 115 F.4th 90, 119 (2024) ...........................................................26

In re Owens, 552 F.3d 958, 960 (9th Cir. 2009)........................................................2

*In re Pourteymour,* No. 20-05522-CL11, 2023 WL 2929323 (9th Cir. BAP Apr. 12, 2023).................................................................... 19, 27, 28

*Lujan v. Defs. Of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130 (1992) ..................20

Markley v. In re Cambridge Land Company II, LLC (In re Cambridge Land Company II, LLC), 626 B.R. 319, 323 (9th Cir. BAP 2021)..........................2, 21

*Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963 (1988) ..........29

*Summit Coffee Company v. Herby's Foods, Inc. (In re Herby's Foods, Inc.),* 2 F.3d 128, (5th Cir. 1993) ........................................................................31

## Statutes

11 U.S.C. § 1112(b) .............................................................................2, 17

11 U.S.C. § 349(b) ......................................................................... 14, 18, 23

11 U.S.C. § 349(b)(3)..................................................................... 20, 22, 29

11 U.S.C. § 502(a) ....................................................................................30

11 U.S.C. § 510(c)(1)................................................................................31

**Rules**

Fed. R. Bankr. P. 9019(a) ........................................................................5, 6

# I. **JURISDICTIONAL STATEMENT**

Debtor Reno City Center Owner, LLC ("Debtor") agrees with Appellants Christopher Beavor, Bristlecone Management, LLC, CAI Reno Hotel OZ Fund, LLC, CAI Development, LLC, CAI Investments, LLC, CAI Investments Healthcare Products II DST, CAI Investments Sub Series 300, LLC, CAI Reno Hotel Partners, LLC, CAI Tempe Hotel Partners, LLC, PFM Harvard, LLC, and Silver State Realty & Investments (collectively, "Appellants") that the United States Bankruptcy Court for the District of Nevada (the "Bankruptcy Court") had jurisdiction over this case and that venue was proper in that district.

The Court would have jurisdiction over this appeal, pursuant to 28 U.S.C. § 158, however, Appellants lack standing to appeal the Order Dismissing the Chapter 11 Case and Granting Related Relief (the "Dismissal Order") entered by the Bankruptcy Court under both Article III of the United States Constitution and the "person aggrieved" standard, as explained in Section V(A), below. Accordingly, the Court should dismiss this appeal.

## II.  STATEMENT OF THE ISSUES PRESENTED
## AND STANDARD OF REVIEW

1.  Whether Appellants lack standing to appeal the Dismissal Order where Appellants cannot establish either Article III standing or that they are "aggrieved" by the Dismissal Order.  The Court reviews Article III standing de novo.  *Clifton Capital Group, LLC v. Sharp (In re East Coast Foods, Inc.)*, 80 F.4th 901, 905 (9th Cir. 2023).  The question of "whether an appellant is a 'person aggrieved' by the order appealed is a question of fact" that the Court reviews "in the first instance." *Markley v. In re Cambridge Land Company II, LLC (In re Cambridge Land Company II, LLC)*, 626 B.R. 319, 323 (9th Cir. BAP 2021).

2.  Whether the Bankruptcy Court properly exercised its discretion to enter the Dismissal Order pursuant to 11 U.S.C. § 1112(b), despite Appellants' objection that the Dismissal Order constituted a priority-skipping structured dismissal in violation of *Czyzewski v. Jevic Holdings Corp.*, 580 U.S. 451, 137 S. Ct. 973 (2017) ("Jevic").  The Court reviews the Bankruptcy Court's decision to dismiss a case under § 1112(b) for abuse of discretion.  *In re Owens*, 552 F.3d 958, 960 (9th Cir. 2009).

## III.  STATEMENT OF THE CASE

Appellants appeal the Bankruptcy Court's entry of the Dismissal Order, which (1) provided the only viable lifeline for Debtor facing a looming deadline to satisfy a settlement agreement with its secured lender and preserve its single asset against

foreclosure; and (2) left unimpaired Appellants' rights and remedies against Debtor that would have been valueless if the Bankruptcy Court did not enter the Dismissal Order and the secured lender foreclosed on Debtor's single asset.

## A.    <u>Debtor's Pre-Bankruptcy History.</u>

On or about September 30, 2020, Reno City Center, LLC ("RCC") acquired from Harrah's Reno LLC certain real property located in downtown Reno, Nevada previously operated as the Harrah's Hotel & Casino and now commonly referred to as the Reno City Center Project (the "Property"). [4-ER-1491-92.] Bristlecone Management, LLC ("Bristlecone"), an entity owned and managed by an individual, Christopher Beavor ("Beavor"), acted as the manager of RCC. [*Id.* at 1492.]

In June 2022, Delphi CRE Funding, LLC ("Delphi") provided a loan to refinance the existing debt securing the Property. [*Id.*] As part of the refinance, Delphi required that RCC form two new entities, Debtor and Reno City Mezzanine Borrower, LLC ("Mezzanine"), which is the sole member of Debtor. [*Id.*] Bristlecone was named manager of both Debtor and Mezzanine. [*Id.*] RCC transferred title to the Property to Mezzanine, which then transferred title to the Property to Debtor. [*Id.*] Debtor was the borrower under the loan documents with Delphi. [*Id.* at 1497-98.] Beavor personally guaranteed the Delphi loan. [*Id.*]

In June 2023, the majority members of RCC removed Bristlecone as manager of RCC, Mezzanine, and Debtor after an investigation revealed that Beavor and

Bristlecone had misappropriated millions of dollars of Delphi loan funds through transfers to Beavor's other entities and projects, as well as for Beavor's personal use. [3-ER-1168, 1172-73.] Bristlecone was replaced by RCC Manager, LLC as manager of RCC, and by RCC as manager of Mezzanine and Debtor. [4-ER-1493.] Bristlecone filed a state-court lawsuit against the majority members of RCC alleging that it was wrongfully removed as manager or RCC. [7-ER-2289.] The state court denied Bristlecone's request for a temporary protective order and preliminary injunction, finding it had not met its burden of showing irreparable harm, and the case was referred to arbitration. [*Id.*] The arbitration remains pending.[1] (Appellants' Br. at 9.)

Delphi first declared a default under the loan in April 2023. [2-ER-331.] In January 2024, Delphi commenced foreclosure proceedings against the Property. [*Id.*] On February 5, 2024, Delphi commenced an action to appoint a receiver. [*Id.* at 332.]

**B.    Debtor's Bankruptcy Case.**

On February 16, 2024 (the "Petition Date"), Debtor filed its Voluntary Petition for Non-Individuals Filing for Bankruptcy (the "Petition") in the Bankruptcy Court, commencing that Chapter 11 case known as *In re: Reno City*

---

[1] Neither Debtor nor Mezzanine are parties to the state court action or the arbitration. RCC was named as a "nominal respondent" only.

*Center Owner, LLC*, Case No. 24-50152-hlb (the "Bankruptcy Case"). [1-ER-1-28.]

Debtor's Petition designated the Bankruptcy Case as a Single Asset Real Estate case.

[*Id*. at 3.]

**C.     <u>Debtor's Settlement with Delphi.</u>**

On April 4, 2024, Delphi filed its Proof of Claim asserting a claim in the amount of $106,404,600.05 secured by the Property (the "Delphi Claim"). [1-ER-161-170.] Delphi stated that payment of the entire Delphi Claim was necessary to cure Debtor's default as of the Petition Date. [*Id*. at 163.]

On May 16, 2024, Debtor filed its initial Plan of Reorganization and a [Proposed] Disclosure Statement. [*Id*. at 194-261.]

On June 7, 2024, Delphi filed its Motion for Relief from the Automatic Stay (the "Motion for Relief"). [2-ER-326-717.] In its Motion for Relief, Delphi asked the Bankruptcy Court to terminate the automatic stay to exercise its state law remedies and rights in connection with the Property, including the prepetition receivership action and foreclosure. [*Id.* at 3229]

On August 29, 2024, Debtor filed a Motion for Approval of Debtor's Compromise and Settlement of Claims with Delphi CRE Funding LLC Pursuant to Fed. R. Bankr. P. 9019(a) (the "9019 Motion"), in which Debtor requested the Bankruptcy Court approve a Settlement Agreement with Delphi that was attached as Exhibit A to the Settlement Motion. [3-ER-1174.] Appellants filed an opposition

to the Settlement Motion. [*Id*. at 1443-64.]

Also on August 29, 2024, Debtor filed its Amended Plan of Reorganization and a [Proposed] Amended Disclosure Statement. [*Id*. at 1227-1420.] Amongst other things, Debtor classified Appellant's Claims (as defined below) in Class 6 as "Disputed Insider Claims" and proposed equitably subordinating the Appellant Claims to the level of equity, to the extent such Appellant Claims were allowed by the Bankruptcy Court or by agreement with Debtor. [*Id*. at 1241, 1243-44.]

On October 18, 2024, after a lengthy hearing, the Bankruptcy Court entered its Order Granting Motion for Approval of Debtor's Compromise and Settlement of Claims with Delphi CRE Funding LLC Pursuant to Fed. R. Bankr. P. 9019(a) (the "9019 Order") in which it approved the Settlement Agreement. [*Id*. at 1480-85.] The terms of the Settlement Agreement that are relevant to this appeal include the following:

1.  Debtor agreed that Delphi would receive an allowed secured claim in the amount of $47,500,000.00 in the Bankruptcy Case (the "Delphi Secured Claim") and an allowed unsecured claim in the amount of $58,904,600 in the Bankruptcy Case (the "Delphi Unsecured Claim"). [SER-8.]

2.  Debtor agreed to pay the Delphi Secured Claim as follows: (1) an initial payment of not less than $10,000,000.00 on or before October 15, 2024 (the "Initial Payment"); and (2) the remaining balance of the Secured Claim no later than December 31, 2024 (the "Final Payment"). [*Id.* at 8.]

3.  Debtor agreed to assign and transfer to Delphi all claims, causes of action and other litigation rights that Debtor may hold against

Appellants (defined as the "Beavor Litigation"). [*Id.*]

4. Upon receipt of the full payment of the Delphi Secured Claim and assignment of the Beavor Litigation, Delphi agreed to release and reconvey its Deed of Trust and release any security instruments recorded or filed against the Property, and to subordinate the Unsecured Claim to all other allowed unsecured claims in the Bankruptcy Case. [*Id.*] Delphi agreed not to seek further payment of the Delphi Unsecured Claim from Debtor; however, the Delphi Unsecured Claim remained an allowed claim for all other purposes. [*Id.*]

5. "In the event [Debtor] seeks dismissal of its Bankruptcy Case for any reason, such dismissal shall be conditioned upon [Debtor's] satisfaction of its payment obligations and the assignment of the Beavor Litigation to Delphi pursuant to the terms of this Agreement, all of which shall be adopted and incorporated into any order the Bankruptcy Court dismissing the Bankruptcy Case, it being acknowledged and agreed to by the Parties that this Agreement shall survive and be enforceable after such dismissal of the Bankruptcy Case." [*Id.* at 9]

6. "Upon an Event of Default, Delphi shall be entitled to pursue any and all rights and remedies available to it against [Debtor], including state court remedies. In addition, if [Debtor] fails to timely make the payments on the [Delphi] Secured Claim as set forth in Section 2(a), the automatic stay under 11 U.S.C. § 362(d)(1) shall immediately be terminated for cause to allow Delphi to pursue foreclosure of its collateral, including the Property." [*Id.*]

Debtor made the Initial Payment on October 15, 2024. [4-ER-2045.] On December 26, 2024, Debtor filed its Motion to Amend Debtor's Compromise and Settlement of Claims (the "Motion to Amend 9019 Order") with Delphi. [3-ER-1850-58.] In the Motion to Amend 9019 Order, Debtor reported that the cost of obtaining financing to make the Final Payment by December 31, 2024, was excessive; that Debtor was in the process of obtaining more cost-effective financing

that would close on or before February 28, 2025; and that Delphi granted an extension of time through March 1, 2025, to make the Final Payment in exchange for an additional payment in the amount of $5,000,000.00. [*Id.* at 1852-53.] Appellants opposed the Motion to Amend 9019 Order. [*Id*. at 1864-74, 4-ER-1875-80.]

On January 10, 2025, after a hearing, the Bankruptcy Court entered its Order Granting Debtor's Motion to Amend Debtor's Compromise and Settlement of Claims with Delphi CRE Funding LLC (the "Amended 9019 Order"), in which it approved the Settlement Agreement Amendment attached thereto as Exhibit A, and extended the deadline for the Final Payment to March 1, 2025. [*Id*. at 2038-49.]

Appellants did not appeal either the 9019 Order or the Amended 9019 Order. [*See* Docket.]

## D.     **Appellants' Claims and Debtor's Objections Thereto.**

On June 21, 2024, Appellants filed Proof of Claim Nos. 38 through 48 (the "Appellant Claims"). [3-ER-718-1146.]   In sum the Appellant Claims totaled $141,064,820.38. [*See id.*]  The Appellant Claims relate to the management of RCC by Bristlecone/Beavor, Beavor's alleged claim for indemnification on his personal guaranty and the alleged intercompany loans involving the other Beavor-related entities that led to the removal of Bristlecone/Beavor as manager of RCC.  [*Id*. at 1172-73.]

8

Debtor objected to each of the Appellant Claims, as follows:[2]

1. On November 14, 2024, Debtor filed its Objection to Proof of Claim No. 46 Filed by Christopher Beavor. [5-ER-1729-1748.] Debtor showed, *inter alia*, that Beavor was not entitled to indemnification from Debtor because (1) Beavor expressly waived rights to indemnification for any liability pursuant to the personal guaranty; (2) numerous examples of misappropriation of Debtor's funds to Appellants during the period that Bristlecone managed RCC; and (3) Beavor had not provided proof of damages in his individual capacity. [*Id.* at 1761-64.]

2. On December 17, 2024, Debtor filed its Objection to Proofs of Claim Nos. 17 and 18 filed by Luxe Industries, LLC ("Luxe"), the general contractor for the Project that was controlled by Beavor. SER-20-70. Debtor showed, *inter alia*, that Luxe was not entitled to recovery from Debtor due to unintelligible allegations and lack of any documentation supporting the claim.

3. On February 6, 2025, Debtor filed its Omnibus Objection to Proof of Claim Nos. 38, 40, 42, 43, 44, 45, and 47, and objected to the proofs of claim filed by Appellants CAI Reno Hotel OZ Fund, LLC, CAI Development, LLC, CAI Investments Healthcare Products II, DST, CAI Investments Sub Series 300, LLC, CAI Reno Hotel Partners LLC, CAI Tempe Hotel Partners, LLC, and PFM Harvard, LLC. [7-ER-2128-2184.] Debtor primarily objected to these Appellant Claims on the basis that the respective Appellant failed to produce evidence of the alleged intercompany loans. [*Id.* at 2135-40.]

4. Also on February 6, 2025, Debtor filed its Objection to Allowance of Proof of Claim No. 39 Filed by Bristlecone Management, LLC. [*Id.* at 2185-236.]

5. On February 18, 2025, Debtor filed its Objection to Allowance of Proof of Claim No. 41 filed by CAI Investments, LLC. [8-ER-2554-640.]

---

[2] Appellants' Brief misrepresents the record by asserting that Debtor did not file any objections to the claims of CAI Investments, LLC or Silver State Realty Investments. (Appellants' Br. at 27-28.) Appellants included Debtor's objections to the claims of CAI Investments, LLC and Silver State Realty Investments in their Excerpts of Record. [8-ER-2554-640, 2641-730.]

9

6. Also on February 18, 2025, Debtor filed its Objection to Allowance of Proof of Claim No. 41 filed by Silver State Realty & Investments. [*Id.* at 2641-730.]

The Bankruptcy Court did not rule on any of the claim objections. [*See* Docket.]

**E.    The Competing Plans of Reorganization.**

On November 2, 2024, Debtor filed its Second Amended Disclosure Statement and its Second Amended Plan of Reorganization. [4-ER-1486-706.] Debtor's proposed Second Amended Plan of Reorganization bifurcated the Delphi Secured Claim and the Delphi Unsecured Claim and proposed payment of the Delphi Secured Claim in accordance with the 9019 Order. [*Id.* at 1613.] The proposed Second Amended Plan of Reorganization continued to classify the Appellant Claims in Class 6 as "Disputed Insider Claims" and proposed to equitably subordinate the Appellant Claims to the level of equity. [*Id.* at 1614.] Debtor subsequently filed its First Amendment to Second Amended Disclosure Statement and its First Amendment to Second Amended Plan of Reorganization following the Amended 9019 Order. [6-ER-2004-33.]

On November 13, 2024, Beavor filed the Motion of Christopher Beavor to Terminate the Debtor's Exclusivity Period Pursuant to 11 U.S.C. § 1121(D) (the "Motion to Terminate"). [5-ER-1707-28.] After a hearing on January 24, 2024, the Bankruptcy Court entered an order on February 4, 2025, granting the Motion to

Terminate and ordering that Beavor file a plan and disclosure statement by February 7, 2024, and entered a separate Order vacating the confirmation hearing on Debtor's Plan set for February 7, 2024. [6-ER-2119-23.]

On February 7, 2025, Appellants Beavor and CAI Development, LLC filed CAI's Plan of Reorganization (the "CAI Plan") and a Disclosure Statement. [7-ER-2237-88.] The CAI Plan proposed that a Beavor controlled entity named CAI Reno Acquisition LLC would purchase substantially all the assets of the Debtor for $75,000,000.00 on the Effective Date, which the CAI Plan defined to mean no sooner than 60 calendar days after a final confirmation order. [*Id*. at 2244.] CAI Reno Acquisition LLC disclosed that it needed to obtain the $75,000,000.00 purchase price through a combination of securities offerings and/or a loan. [*Id*. at 2304-06.]

The CAI Plan had no possibility of being confirmed prior to the March 1 deadline to pay Delphi pursuant to the Amended 9019 Order (if ever), did not provide for payment to Delphi prior to that deadline, did not explain how CAI Reno Acquisition LLC – a non-party to the Settlement Agreement – could require Delphi to honor the Settlement Agreement, and did not provide any indication that Delphi would agree to extend the Final Payment deadline. [*See id*. at 2237-88.]

F.     **Debtor's Motion to Dismiss the Bankruptcy Case**

Faced with the prospect of a contested confirmation hearing over competing

plans – and an impossible timeline of only 18 days until the deadline for the Final Payment to Delphi due on or before March 1, 2025, within which to confirm and consummate a chapter 11 plan – Debtor filed its Motion to Dismiss Chapter 11 Case and for Related Relief (the "Motion to Dismiss") on February 11, 2025. [*Id*. at 2389-437.] Debtor moved to voluntarily dismiss the Bankruptcy, pursuant to 11 U.S.C. § 1112(b), so that it could consummate a "Refinancing Transaction" and facilitate a timely Final Payment to Delphi. [*Id*. at 2395.]

Debtor attached to its Motion to Dismiss the terms of the proposed Refinancing Transaction in the form of an Irrevocable Letter of Intent from Madison Capital Group LLC ("Madison")[3] dated February 5, 2025 (the "LOI"), which set forth the terms and conditions upon which Madison would refinance the Delphi loan (the "Refinance Transaction"). [*Id*. at 2407-28.] The LOI proposed a loan from Madison to Debtor in the amount of $42,000,000.00 on or about February 28, 2025. [*Id*. at 2408.] To secure the loan, Madison would receive a junior deed of trust subordinate to any existing senior liens on the Property, including all currently recorded mechanic's liens. [*Id*.] Debtor would use the loan to make the Final Payment to Delphi, pay administrative expenses from the Bankruptcy Case, and pay

---

[3] Madison was the source of $4,000,000.00 of the $10,000,000.00 Initial Payment paid to Delphi on October 15, 2024, and the source of the $5,000,000.00 paid to Delphi on December 31, 2024, in exchange for Delphi extending the Final Payment deadline to March 1, 2025. [7-ER-2440.] The payments were made in the form of equity contributions to Debtor's indirect parent, RCC. [*Id*.]

allowed unsecured creditors in amounts listed in Exhibit B to the LOI. [*Id.*] The LOI provided that "Lender's obligation to disburse the Loan is contingent upon [Debtor] obtaining dismissal of its Bankruptcy Case prior to the Loan disbursement date of February 28, 2025." [*Id.*]

Debtor argued that the Bankruptcy Court should dismiss the Bankruptcy Case because: (a) the automatic stay would terminate if Debtor failed to pay the Final Payment to Delphi prior to March 1, 2025; (b) Delphi would be entitled to exercise foreclosure remedies to enforce payment of the full amount of its secured claim ($106,404,600.05), rather than the remaining, reduced Delphi Secured Claim ($37,500,000.00); (c) foreclosure would wipe out all potentially junior mechanic's lienholders; and (d) Debtor, as a single asset real estate entity, would have no ability to pay administrative or operating expenses or any allowed unsecured claims. [*Id.* at 2397-98.]

Appellants filed an Opposition of Beavor Related Parties to Debtor's Motion to Dismiss Chapter 11 Case and Related Relief (the "Appellant Opposition"). [*Id*. at 2459-81.] Appellants argued that Debtor's requested dismissal violated *Jevic* because it allowed the owners of Debtor to retain their equity without providing for any payment to Appellants on the Appellant Claims. [*Id.* at 2472.]

Debtor filed an Omnibus Reply to Beavor and Affiliated Entities' Oppositions to Debtor's Motion to Dismiss Chapter 11 Case. [8-ER-2731-2749.] Debtor

13

emphasized for the Bankruptcy Court that its Motion to Dismiss garnered support from four supporting stakeholders, including the Official Committee of Unsecured Creditors. [*Id.* at 2734.] In reply to the Appellant Opposition, Debtor argued that the Motion to Dismiss did not violate *Jevic* because the dismissal would revest the property of the estate in the entity in which such property was vested immediately before the commencement of the Bankruptcy Case, pursuant to 11 U.S.C. § 349(b), and Debtor was not asking the Bankruptcy Court to condition dismissal on any payments to creditors. [*Id.* at 2739-40.] Debtor further argued that dismissal was the only viable option for satisfying the Final Payment to Delphi by the March 1 deadline and that the two-party dispute between Appellants and Debtor could proceed in other forums. [*Id.* at 2739.]

## G.    Dismissal of the Bankruptcy Case.

On February 19, 2025, the Bankruptcy Court held a hearing on the Motion to Dismiss. [*Id.* at 2781-843.] In addition to hearing argument from counsel for the Debtor and Appellants, the Bankruptcy Court asked counsel for U.S. Trustee "what the United States Trustee thinks of this dismissal." [*Id.* at 2806:4-5.] Counsel for the U.S. Trustee responded that the U.S. Trustee did not oppose dismissal because the proposed dismissal did not violate *Jevic*:

> We typically do not oppose unless we think there is a – not just a structured dismissal, because we have a lot of cases that dismiss via structured dismissal. It's when there's a violation of the priority skipping requirements of the Bankruptcy Code. And we did not oppose

because we don't see that being proposed here. … [W]e do not oppose dismissal of this case, and we would've likely filed a written opposition had we seen a violation of *Jevic* or priority skipping.

[*Id.* at 2806:13-2807:3.]

After arguments concluded and the Bankruptcy Court took a recess, the Bankruptcy Court issued an oral ruling dismissing the Bankruptcy Case, concluding as follows:

Here in the exercise of its discretion the Court concludes that cause exists to dismiss the Chapter 11 case under Code [1112(b)]. The debtor cannot and will not move forward with its current plan, and the Beavor-related parties have filed a plan that the debtor would contest, and that would not be able to be confirmed within a reasonable time if at all and certainly not in time to pay Delphi the 37.5 million payment or in an amount sufficient to pay Delphi's full debt without the discount.

Continuing the Chapter 11 case would result in further delay in administrative expenses and a lesser recovery to creditors without a clear path to resolution. On this basis alone dismissal is warranted under 1112(b)(4)(A) as the debtor is unable to effectuate a plan and has no reasonable likelihood of rehabilitation.

Delphi is the 800-pound gorilla in the room. The debtor can pursue its refinance with Madison to pay Delphi only if the bankruptcy case is dismissed. While success is not a foregone conclusion, after all the transaction still has to close, allowing the debtor to pursue the refinance to pay Delphi will provide the debtor an opportunity to stave off foreclosure and benefit all creditors an opportunity that the debtor does not have within bankruptcy.

[*Id.* at 2838:25-2839:22.][4]

---

[4] The Bankruptcy Court considered conversion of the Bankruptcy Case to Chapter 7 or appointment of a Chapter 11 trustee as an alternative to dismissal, but reasoned that doing so "will ensure that the debtor cannot make the Delphi payment, thus

Finally, the Bankruptcy Court also considered, and rejected, Appellants' *Jevic* objection:

> While the Beavor-related parties raise a *Jevic* objection regarding the priority of payments out of the proceeds of the contemplated refinance, the Court finds that the dismissal does not deviate from the Bankruptcy Code's priority scheme in violation of *Jevic*. The debtor is not disposing of its assets as part of the dismissal, and the Court will not enter an order that requires payment of certain creditors over others as a condition to the dismissal, except as it relates to Delphi. The Court has already approved the settlement agreement which requires that any dismissal order will reference and incorporate the settlement agreement.
>
> The dismissal will not alter the rights of lower priority creditors. And the Court notes that some of those creditors joined in the motion. The Beavor related party's rights specifically will not be altered by the dismissal. They retain their rights and revenues [*sic.*] against the debtor. Based on the foregoing pursuant to Bankruptcy Code section 1112(b), the Court finds and concludes that dismissal of the Chapter 11 case is warranted and in the best interest of creditors and the estate. So the motion to dismiss will be granted.

[*Id.* at 2840:14-2841:8.]

On February 26, 2025, the Bankruptcy Court entered its Order Dismissing the Chapter 11 Case and Granting Related Relief (the "Dismissal Order"). [*Id.* at 2750-58.] The Dismissal Order incorporated the Bankruptcy Court's oral findings of fact and conclusions of law, and dismissed the Bankruptcy Case "effective immediately upon entry of this Order on the Court's docket." [*Id.* at 2753.] The Dismissal Order further provided:

---

enabling the state [*sic.*] to lift [the automatic stay] and enabling Delphi to foreclose." [*Id.* at 2839:25-2840:1.]

16

2.	The Debtor is authorized and empowered to do and perform all acts necessary to implement the Refinance Transaction with Madison Capital Group, LLC or its assignee as contemplated in the Motion; provided, however, that the Court is not hereby approving the terms of such Refinance Transaction as the Closing of the Refinance Transaction is intended to take place after dismissal of this Bankruptcy Case.

3.	The Debtor is authorized, as set forth in the Refinance Transaction (but not ordered), to pay, from the proceeds of the Refinance Transaction, the Final Payment due to Delphi CRE Funding, LLC ("Delphi") under the terms of the parties' Settlement Agreement, and concurrently assign the Beavor Litigation to Delphi pursuant to the terms of the Settlement Agreement, all of which are adopted by and incorporated into this Order and the Settlement Agreement shall expressly survive and be enforceable after dismissal of the Bankruptcy Case as set forth in the Settlement Agreement.

[*Id.* at 2753-54.][5]

The Dismissal Order did not mention payments to any other creditors of Debtor. [*See id.*]

## IV.	SUMMARY OF THE ARGUMENT

Appellants do not dispute the Bankruptcy Court's finding of "cause" under 11 U.S.C. § 1112(b), or challenge the court's determination that dismissal, rather than conversion, was in the best interests of creditors and the estate. Rather, Appellants argue solely that the Dismissal Order violated *Jevic* because it expressly or implicitly provided for a structured dismissal which deviated from the ordinary priority scheme

---

[5] The language in the Dismissal Order authorizing Debtor to consummate the Refinance Transaction was inserted to satisfy title insurers. [8-ER-2794:21-2795:11, 2841:9-16.]

17

under the Bankruptcy Code.

Appellants lack standing to appeal the Dismissal Order. The Dismissal Order did not dispose of Debtor's assets and did not impair Appellants rights or remedies against Debtor. As a result, Appellants cannot demonstrate either an "injury in fact" to confer Article III standing, or that they are "aggrieved" to show prudential standing, and the Court should dismiss this appeal.

Even if Appellants had standing to appeal the Dismissal Order, they cannot satisfy their heavy burden to demonstrate that the Bankruptcy Court abused its discretion by entering the Dismissal Order. *Jevic* prohibits a bankruptcy court from "approv[ing] a structured dismissal that provides for distributions that do not follow ordinary priority rules without the affected creditors consent." *Jevic*, 580 U.S. at 465, 137 S. Ct. at 983. Appellants' *Jevic* argument fails for multiple reasons, the most fundamental of which is that the Dismissal Order did not provide for any priority-skipping distributions. Contrary to Appellants' mischaracterization of the Dismissal Order, it did not order distributions to equity or unsecured creditors. Instead, the Dismissal Order restored the prepetition status quo subject to the adoption and incorporation of the Settlement Agreement with Delphi, a secured creditor, which was authorized under 11 U.S.C. § 349(b). Appellants also assert that the Bankruptcy Court implicitly conditioned dismissal on payment to certain creditors because it granted Debtor's motion in which Debtor stated its intention to

pay specified creditors following dismissal. The Court previously considered – and rejected – this exact implicit structured dismissal argument in *In re Pourteymour*, No. 20-05522-CL11, 2023 WL 2929323 (9th Cir. BAP Apr. 12, 2023) (nonprecedential).[6]

Accordingly, the Court should either dismiss the appeal for lack of standing or find that the Bankruptcy Court did not abuse its discretion and affirm the Dismissal Order.

## V.     ARGUMENT AND CITATION OF AUTHORITIES

### A.     Appellants Lack Standing to Appeal the Dismissal Order.

The Court should dismiss Appellants appeal because Appellants cannot demonstrate either an "injury in fact" to confer Article III standing, or that they are "aggrieved" to show prudential standing.

#### 1.     Appellants Lack Article III Standing.

"[A] party must establish an Article III case or controversy before [the Court] exert[s] subject matter jurisdiction," and, "[a]s the party invoking federal jurisdiction, [Appellants] bear[ ] the burden of establishing the elements of Article III standing." *East Coast Foods, Inc.,* 80 F.4th at 905, 906. To have standing, Appellants must show they have "(1) suffered an 'injury in fact' that is concrete, particularized, and actual or imminent, (2) the injury is 'fairly traceable' to the

---

[6] Although *Pourteymour* was designated as a nonprecedential Memorandum under 9th Cir. BAP R. 8024-1(c)(2), this panel should adopt its reasoning.

defendant's conduct, and (3) the injury can be 'redressed by a favorable decision.'" *Id.* (quoting *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130 (1992)).

Appellants lack Article III standing because they cannot show that they suffered an "injury in fact" as a result of the Dismissal Order. The Bankruptcy Court specifically found that "the debtor is not disposing of its assets as part of the dismissal" and Appellants' "rights specifically will not be altered by the dismissal. They retain their rights and revenues [*sic.*] against the debtor." [8-ER-2840:14-2841:8.] That is because the effect of the Dismissal Order was to "revest[ ] the property of the estate in the entity in which such property was vested immediately before the commencement of the [Bankruptcy Case]." 11 U.S.C. § 349(b)(3). Since the Dismissal Order did not dispose of any assets of the Debtor, and Appellants retain their prepetition rights against Debtor, Appellants did not suffer any injury from the Dismissal Order. *See East Coast Foods, Inc.,* 80 F.4th at 910 (creditor lacked standing to appeal fee application where plan did not relate to a limited fund).

On the other hand, had the Bankruptcy Court not entered the Dismissal Order, Debtor would have been unable to make the Final Payment to Delphi, Delphi would have foreclosed on the Property – the Debtor's single asset – and the Appellant Claims would have been wiped out. Thus, Appellants, who retain their claims against a Debtor with an asset, are unlike the creditors in *Jevic* who had standing to appeal the structured dismissal in that case that disposed of the debtor's property and

the appealing creditors "lost a chance to obtain a settlement that respected their priority" or "the power to bring their own lawsuit on a claim that had a settlement value of $3.7 million." *Jevic*, 580 U.S. at 464, 137 S.Ct. at 983. Accordingly, Appellants cannot show an injury in fact to give them Article III standing to appeal the Dismissal Order.

### 2. Appellants Lack Prudential "Person Aggrieved" Standing.

Assuming, *arguendo*, Appellants could show Article III standing, they would then have to satisfy the "person aggrieved" standard to satisfy the Court's prudential standing requirement. *East Coast Foods, Inc.,* 80 F.4th at 906, 910 n.10. "To have standing to appeal a decision of the bankruptcy court, an appellant must show that it is a person aggrieved who was directly and adversely affected pecuniarily by an order of the bankruptcy court." *Cambridge Land Company II, LLC*, 626 B.R. at 323 (quotation omitted). "A 'person aggrieved' is someone whose interest is directly affected by the bankruptcy court's order, either by a diminution in property, an increase in the burdens on the property, or some other detrimental effect on the rights of ownership inherent in the property." *Id.* ("The orders at issue left the Malpractice Defendants to defend against the malpractice action in state court, and did not prevent them from asserting any defenses in that action, which they have been capably asserting … .")

Appellants cannot argue with a straight face that they are aggrieved. The

Dismissal Order, which incorporated the Settlement Agreement, facilitated the Refinance Transaction to give the Debtor a fighting chance at survival, as opposed to Delphi foreclosing on Debtor's single asset and eliminating any possibility of a future payment to Appellants. Appellants remain free to exercise whatever state law rights they may have against the Debtor and cannot sincerely argue that they were "directly and adversely affected pecuniarily" by the Dismissal Order. Accordingly, the Court should dismiss Appellants' appeal for lack of standing.

**B.** **The Dismissal Order Does Not Violate *Jevic*.**

Should the Court reach the merits of this appeal, it should find that the Dismissal Order does not violate *Jevic* and, therefore, the Bankruptcy Court did not abuse its discretion by entering the Dismissal Order. A summary of the *Jevic* holding, as compared to the content and effect of the Dismissal Order, demonstrates why Appellants' arguments fail and the Court should affirm the Dismissal Order.

**1.** **Structured Dismissals and the *Jevic* Holding.**

Dismissal of a Chapter 11 case "typically 'revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case'—in other words, it aims to return to the prepetition financial status quo." *Jevic*, 580 U.S. at 456, 137 S. Ct. at 979 (quoting 11 U.S.C. § 349(b)(3)). "Nonetheless, recognizing that conditions may have changed in ways that make a perfect restoration of the status quo difficult or impossible, the Code permits the

bankruptcy court, 'for cause,' to alter a Chapter 11 dismissal's ordinary restorative consequences." *Id.* (quoting 11 U.S.C. § 349(b)). A dismissal that alters a Chapter 11 dismissal's ordinary restorative consequences "is often referred to as a 'structured dismissal,' defined by the American Bankruptcy Institute as a

> hybrid dismissal and confirmation order ... that ... typically dismisses the case while, among other things, approving certain distributions to creditors, granting certain third-party releases, enjoining certain conduct by creditors, and not necessarily vacating orders or unwinding transactions undertaken during the case.

*Id.* (citation omitted).

*Jevic* "concern[ed] the interplay between the Code's priority rules and a Chapter 11 dismissal." *Id.* at 457, 137 S. Ct. at 979. In that case, the bankruptcy court " instead of reverting to the prebankruptcy status quo, ordered a distribution of the estate assets to creditors by attaching conditions to the dismissal (*i.e.,* it ordered a structured dismissal)." *Id.* at 457, 137 S. Ct. at 980. The problem in *Jevic* was that the court approved a proposed settlement that violated the Code's priority scheme by providing distributions to low-level general unsecured creditors, but not to the petitioners who held a mid-level priority claim. *Id.* at 460-61, 137 S. Ct. at 981. The Court held that "[a] distribution scheme ordered in connection with the dismissal of a Chapter 11 case cannot, without the consent of the affected parties, deviate from the basic priority rules that apply under the primary mechanisms the Code establishes for final distributions of estate value in business bankruptcies." *Id.*, at

455, 137 S. Ct. at 978.

2. **The Dismissal Order is Not a Priority-Skipping Structured Dismissal.**

The Dismissal Order is not a priority-skipping structured dismissal that violates *Jevic* for at least three reasons. First, and most fundamentally, the Dismissal Order did not order a distribution of estate assets. [8-ER-2753-54.] The Dismissal Order *authorized* Debtor to "implement the Refinance Transaction with [Madison]" and "pay, from the proceeds of the Refinance Transaction, the Final Payment due to [Delphi]" – but expressly stated "that the Court is *not hereby approving* the terms of such Refinance Transaction as the Closing of the Refinance Transaction is intended to take place after dismissal of this Bankruptcy Case," and that the Debtor was "*not ordered*" to pay the Final Payment to Delphi. *Id.* (emphasis added). The Dismissal Order did not so much as mention any other creditor. In other words, the Dismissal Order generally restored the prepetition financial status quo, which allowed a post-bankruptcy Debtor to decide to close the Refinance Transaction, make the Final Payment to Delphi, and otherwise control its own finances without the supervision of the Bankruptcy Court like any other non-bankrupt entity.

Second, the aspects of the Dismissal Order that constitute a structured dismissal were authorized by the Bankruptcy Code and *Jevic*. Specifically, the Dismissal Order: (1) preserved the previously approved (and unappealed) Settlement Agreement between Debtor and Delphi; and (2) ordered payment of US Trustee

quarterly fees. [*Id.*] Section 349(b) authorizes a bankruptcy court to alter the prepetition financial status quo "for cause," which the *Jevic* court recognized as "the flexibility to make the appropriate orders to protect rights acquired in reliance on the bankruptcy case." *Id.*, at 466, 137 S. Ct. at 984. The Dismissal Order protected the rights that Debtor and Delphi – a secured creditor – acquired through their negotiation of the Settlement Agreement in reliance on the bankruptcy case, and protected the rights of the US Trustee to be paid its quarterly fees. Neither of these conditions affected the rights of Appellants, who are inferior creditors (if creditors at all), or deviated from priority rules.

Lastly, unlike in *Jevic*, the Dismissal Order did not constitute a final distribution of Debtor's assets. In *Jevic*, the Court compared the bankruptcy court's dismissal order to various types of permissible "interim distributions that violate ordinary priority rules" but "enable a successful reorganization and make even the disfavored creditors better off," and held that the dismissal order:

> [did] not preserve the debtor as a going concern; [did] not make the disfavored creditors better off; [did] not promote the possibility of a confirmable plan; [did] not help to restore the *status quo ante;* and [did] not protect reliance interests. In short, we cannot find in the violation of ordinary priority rules that occurred here any significant offsetting bankruptcy-related justification."

*Id.*, at 468, 137 S. Ct. at 985-86. In stark contrast, the Dismissal Order enabled Debtor to restructure its secured debt and made all creditors better off by restoring the status quo, subject to the Settlement Agreement that provided the only avenue

for Debtor to continue as a going concern without Delphi foreclosing on its single asset. *See In re Nordlicht*, 115 F.4th 90, 119 (2024) (no violation of *Jevic* where disputed secured creditor remained free to pursue recourse against the debtor).

3. **Appellants Fail to Demonstrate that the Bankruptcy Court Abused its Discretion by Entering the Dismissal Order.**

Throughout their brief, Appellants mischaracterize the Dismissal Order to engineer a fiction that the Dismissal Order constituted a priority-skipping structured dismissal. Appellants' argument relies on three faulty premises: (1) the Bankruptcy Court implicitly ordered a priority-skipping structured dismissal by granting the Motion to Dismiss because the Motion to Dismiss described Debtor's plan to consummate the Refinance Transaction; (2) the Dismissal Order improperly allowed the majority members of Debtor to retain their equity interests in the Debtor without paying all unsecured claims in full; and (3) the Dismissal Order provided unequal treatment to similarly situated unsecured creditors without the consent of disfavored creditors. Appellants' arguments are not supported by the facts or the law.

a. The Bankruptcy Court Did Not Implicitly Condition Dismissal on Payments to Creditors.

Appellants assert that the Dismissal Order constituted a nonconsensual, priority-skipping structured dismissal because "the Dismissal Order expressly granted the [Motion to Dismiss] and implicitly adopted wholesale the structured dismissal process requested in the [Motion to Dismiss] . . . ." (Appellants' Br. at

20.)

The Court rejected Appellants' exact "implied structured dismissal" argument in *Pourteymour*, 2023 WL 2929323 at *1. In *Pourteymour*, the debtor "proposed a structured dismissal that would pay all arrears, administrative claims, and unsecured creditors" other than a disputed unsecured deficiency claim asserted by his lender. *Id.* at *3. The bankruptcy court found that the debtor's proposed structured dismissal would violate *Jevic*, but nonetheless ordered the case dismissed in the best interests of creditors and the estate. *Id.* at *4. The lender appealed the dismissal of the case arguing "that dismissal was conditioned on Debtor making payments to some, but not all, unsecured creditors and, although the Dismissal Order purports to be a straight dismissal, in substance it provides for a structured dismissal that deviates from the priority scheme under the Bankruptcy Code." *Id.* at *5.

The Court affirmed the dismissal, holding that "[t]he Dismissal Order does not violate the holding of *Jevic* because it provides for a straight dismissal in accordance with § 349, and it neither expressly nor impliedly conditions dismissal on payments to creditors." *Id.* at *7. Key findings by the Court included: (1) "the court stated that property of the estate would revest pursuant to § 349, and it expressly took no position on the parties' respective obligations or remedies if Debtor decided to use DIP Account funds to pay creditors after dismissal," *id.* at *5; (2) the lender "retained its rights and remedies under state law and dismissal merely

returned the parties to the prepetition financial status quo," *id.* at \*6; (3) "Debtor's statements about paying creditors and his understanding of the court's order do not alter the effect of the Dismissal Order, which plainly provides for a straight dismissal … [a]nd the bankruptcy court did not implicitly condition dismissal on payments to creditors," *id.*; and (4) "the bankruptcy court did not improperly rely on Debtors pledge to pay unsecured creditors" and instead reasoned that dismissal was in the best interests of creditors and the estate because "[e]ven if Debtor did not pay all claims upon dismissal, remaining creditors would be in a better position to collect against Debtor's assets and would have fewer claims to compete against," *id.*

As in *Pourteymour*, the Bankruptcy Court knew of Debtor's post-dismissal intentions to consummate the Refinance Transaction, but "expressly took no position on" the Refinance Transaction and did not explicitly or implicitly condition dismissal on payment to any creditor. *Id.* at \*5, 6. The effect of the Dismissal Order in this case was for the Property to revest in the Debtor, for Appellants to retain their purported state-law claims against Debtor, and for Appellants to be in a much "better position to collect against Debtor's asset[]" than if Delphi had foreclosed. *Id.* at \*6. The Dismissal Order in this case provided for a "dismissal in accordance with § 349 and it neither expressly nor impliedly condition[ed] dismissal on payments to creditors." *Id.* at \*7. Accordingly, the Bankruptcy Court did not abuse its discretion by violating *Jevic*.

b.   The Dismissal Order Did Not Favor Equity Over Creditors.

Appellants assert the Dismissal Order favored the equity interests of Debtor's majority members over creditors by allowing the members to retain their interests. (Appellants' Br. at 21-24).   Appellants' argument flatly ignores § 349(b)(3), which provides that dismissal of a bankruptcy case "revests the property of the estate in the entity in which such property was vested immediately before the commencement of the case under this title."   11 U.S.C. § 349(b)(3).   The Dismissal Order did not distribute any assets to equity – rather it dismissed the case, which had the effect of revesting the Property in the Debtor, subject to prepetition interests of creditors.

Appellants rely on *In re Naartjie Custom Kids, Inc.*, 534 B.R. 416 (Bankr. D. Utah 2015), a pre-*Jevic* bankruptcy court opinion approving a structured dismissal. *Naartjie Custom Kids* is easily distinguished because in that case, the dismissal order provided an explicit procedure for a distributing the debtor's assets to unsecured creditors.   *Id.* at 419.   The Dismissal Order in this case does not so much as mention any unsecured creditors.[7]

---

[7] Appellants also cite *Bank of America Nat'l Trust & Sav. Ass'n v. 203 North LaSalle Street Partnership,* 526 U.S. 434, 119 S.Ct. 1411 (1999) and *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963 (1988) for the proposition that the absolute priority rule is violated if creditors are not paid and equity holders retain their interests in a Chapter 11 plan.   This case does not involve confirmation of a Chapter 11 plan and the Dismissal Order did not provide for payment to creditors or a distribution to equity.

c.      The Dismissal Order Did Not Favor Other Unsecured Creditors
        Over Appellants.

Appellants also assert that the Dismissal Order violates *Jevic* because it favors

other unsecured creditors over Appellants.  (Appellants' Br. at 24-28.)  Appellants'

argument suffers from the fundamental problem that the Dismissal Order did not

order distributions to any creditors.

Even if the Dismissal Order had endorsed the Refinance Transaction,

including payment to specified unsecured creditors, Appellants are not the victims

of a deviation from the priority scheme without their consent.  Debtor objected to all

of the Appellant Claims, which means the Appellant Claims were not allowed

claims.[8]  *See* 11 U.S.C. § 502(a) ("A claim or interest, proof of which is filed under

section 501 of this title, is deemed allowed, unless a party in interest … objects.")

*See also Nordlicht*, 115 F.4th at 118 ("Until they have established in the underlying

bankruptcy proceedings that their liens are valid, their claims are not secured. And

as unsecured creditors, they have no priority over other unsecured creditors.")

Further, Appellants are all insiders of Debtor and their claims, if allowed,

would have been equitably subordinated to the level of equity due to inequitable

conduct by Beaver and Bristlecone.  *See* 11 U.S.C. § 510(c)(1); *Summit Coffee*

---

[8] Appellants falsely argue that Debtor failed to object to the claims of CAI
Investments, LLC or Silver State Realty Investments.  (Appellants' Br. at 27-28.)
*See* Footnote 2, *supra*.

*Company v. Herby's Foods, Inc. (In re Herby's Foods, Inc.)*, 2 F.3d 128, (5th Cir. 1993) (equitably subordinating insider claims due to inequitable conduct). Thus, even if the Dismissal Order could be read to either explicitly or implicitly condition dismissal on payment to general unsecured creditors, such payment would not offend the ordinary priority rules and violate *Jevic* without Appellants' consent.

## VI.   <u>CONCLUSION</u>

For the foregoing reasons, Debtor respectfully requests the Court either dismiss this appeal for lack of standing or affirm the Bankruptcy Court's Dismisal Order.

This 30th day of July, 2025

**FLETCHER & LEE**

/s/ Elizabeth Fletcher
Elizabeth Fletcher
Nevada Bar No. 10082
488 Ridge Street
Reno, Nevada 89501
Telephone:  775.324.1011
efletcher@flecterlawgroup.com

COUNSEL FOR DEBTOR RENO
CITY CENTER OWNER, LLC

**MORRIS, MANNING & MARTIN LLP**

/s/ Brian J. Levy
Brian J. Levy
Georgia Bar No. 302518
blevy@mmmlaw.com
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
Telephone: (404) 233-7000

COUNSEL FOR DEBTOR RENO CITY
CENTER OWNER, LLC

*Motion for Admission Pro Hac Vice
Pending*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Fed. R. Bankr. P. 8015(h), I certify that the accompanying Brief

of Appellee Reno City Center Owner, LLC is proportionately spaced, has a typeface

of 14 points, and contains 7,520 words, exclusive of the items listed in Fed. R. Bankr.

P. 8015(g).

This 30th day of July, 2025

| | |
|---|---|
| **FLETCHER & LEE** | **MORRIS, MANNING & MARTIN LLP** |
| */s/ Elizabeth Fletcher* | */s/ Brian J. Levy* |
| Elizabeth Fletcher | Brian J. Levy |
| Nevada Bar No. 10082 | Georgia Bar No. 302518 |
| 488 Ridge Street | blevy@mmmlaw.com |
| Reno, Nevada 89501 | 1600 Atlanta Financial Center |
| Telephone: 775.324.1011 | 3343 Peachtree Road, N.E. |
| efletcher@flecterlawgroup.com | Atlanta, Georgia 30326 |
| | Telephone: (404) 233-7000 |
| COUNSEL FOR DEBTOR RENO CITY CENTER OWNER, LLC | COUNSEL FOR DEBTOR RENO CITY CENTER OWNER, LLC |
| | *Motion for Admission Pro Hac Vice Pending* |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing BRIEF OF APPELLEE RENO CITY CENTER OWNER, LLC was served via CM/ECF on all attorneys of record.

This 30th day of July, 2025

**FLETCHER & LEE**

*/s/ Elizabeth Fletcher*
Elizabeth Fletcher
Nevada Bar No. 10082
488 Ridge Street
Reno, Nevada 89501
Telephone: 775.324.1011
efletcher@flecterlawgroup.com

COUNSEL FOR DEBTOR RENO
CITY CENTER OWNER, LLC

**MORRIS, MANNING & MARTIN LLP**

*/s/ Brian J. Levy*
Brian J. Levy
Georgia Bar No. 302518
blevy@mmmlaw.com
1600 Atlanta Financial Center
3343 Peachtree Road, N.E.
Atlanta, Georgia 30326
Telephone: (404) 233-7000

COUNSEL FOR DEBTOR RENO CITY
CENTER OWNER, LLC

*Motion for Admission Pro Hac Vice
Pending*